**TURNER CONSTRUCTION COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 135–257.

United States District Court
S. D. New York.

April 16, 1964.

Spencer & Tunstead, New York City, for plaintiff; Richard H. Tunstead, Austin & Diamond, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for defend-

ant; Clarence M. Dunnaville, Stephen Charnas, Asst. U. S. Attys., of counsel.

## OPINION, FINDINGS OF FACT
### and
## CONCLUSIONS OF LAW

LEVET, District Judge.

The plaintiff-taxpayer, Turner Construction Company (Turner), seeks to recover $67,829.77 of income tax deficiencies assessed by the Commissioner of Internal Revenue. Turner paid the deficiencies and preserved its right to recover the amount by the timely filing of claims for refund. This action presents three separate and distinct claims for refund.

The case was tried to the court without a jury. After hearing the testimony of the parties, examining the exhibits, the pleadings, the briefs and proposed findings of fact and conclusions of law, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### I.

THE TAX TREATMENT OF THE TRANSACTION OF JUNE 1951 INVOLVING THE STOCK OF RIVER CONSTRUCTION CORPORATION.

1. River Construction Corporation (River) was incorporated as a Delaware corporation on April 29, 1947. The purpose of the formation of River was to bid on the construction of Lock No. 27 on the Chain of Rocks Canal near Granite City, Illinois, an aid to the navigation of the Mississippi River for the United States Army, Corps of Engineers; and, if successful, to perform such construction project.

2. River's original stockholders and their stock subscriptions were as follows:

| | | | |
|---|---|---|---|
| 20% Turner Construction Company | 5000 shs. at $100 | $500,000 |
| 20% Raymond Concrete Pile Company | 5000 shs. at $100 | $500,000 |
| 20% Winston Bros. Company | 5000 shs. at $100 | $500,000 |
| 20% Spencer, White & Prentis Inc. | 5000 shs. at $100 | $500,000 |
| 10% Al Johnson Construction Co. | 2500 shs. at $100 | $250,000 |
| 10% Morrison-Knudsen Company Inc. | 2500 shs. at $100 | $250,000 |

Turner paid $500,000 for its stock on or about June 24, 1947.

3. An agreement among the stockholders (each was a corporation) of River, dated May 1, 1947, provided, among other things, that unless River was the successful bidder on the construction project it would be dissolved, and that if it were awarded such contract it would not undertake any other project until Lock 27 was substantially completed, and then only by unanimous consent of the stockholders. The agreement also provided that each of the stockholders would be represented on the six-man board of directors, that none would sell its stock without the consent of the others, and that each stockholder would give River, without charge, the benefit of the advice and experience of its officials. (Ex. 7)

4. On May 28, 1947, River submitted its bid for the construction of Lock 27 of the Chain of Rocks Canal to the United States Army, Corps of Engineers, in the sum of approximately $17,394,000, and was finally awarded the contract in the sum of $16,626,000. The contract, thereafter from time to time, was increased and decreased by modification until the final contract award became $17,710,866.48. Before Lock 27 was finished the United States Army, Corps of Engineers, awarded River a contract for the installation of a 54″ pipe line under the Chain of Rocks Canal. This

pipe line contract, as finally adjusted, amounted to $613,873.54.

5. In June 1947, each of the six stockholders made commitments in writing to the United States Fidelity and Guaranty Co. and its co-sureties (1) to pay the amounts of their original stock subscriptions indicated above and (2) if at any time additional funds were required to finance the contract, Turner, Raymond Concrete & Pile Company, Spencer, White & Prentis, Inc. (Spencer) and Winston Bros. Company would each pay an additional $300,000 and Al Johnson and Morrison-Knudsen would each pay an additional $150,000 to the capital account of River.

6. The construction work for the project was performed by River under the direction of a project manager. Fred Spencer, an employee of Spencer, was the first project manager. Thereafter, in March 1950, he was replaced by Robert Dunlop. However, in addition to the project manager, representatives of the six stockholders actively aided in the project by visiting the project, counselling and advising.

7. By 1950 the stockholders realized that the construction project would incur substantial financial losses. To meet its financial requirements River borrowed substantial funds from banks and from its stockholders. Turner loaned $120,000 on March 20, 1950. This loan was repaid on July 31, 1951. Spencer also loaned $120,000 which was repaid on July 30, 1951.

8. In early 1950, Al Johnson Construction Co. and Winston Bros. Co. expressed a desire to terminate their interests in River. The other stockholders, however, were unwilling to make an agreement with Winston Bros. or Al Johnson or retire their stock for any more than it would ultimately be worth after the Lock 27 and pipe line jobs were completed and the accounts closed. At the time there were pending claims against the Army Corps of Engineers of contingent and uncertain value, and in addition the amount of the losses which would finally result on the jobs could not then be determined. (Ex. 8)

9. An agreement was finally reached whereby River agreed to redeem the Al Johnson and Winston Bros. stock for $36 per share, subject to a reduction in the redemption price equal to the retiring shareholders' pro rata share of the final losses to be incurred on the Lock 27 and pipe line jobs. (Ex. AC, pp. 31, 32) Five per cent of the agreed amount was to be paid down, and non-interest bearing, non-assignable, non-negotiable notes, subordinate to all claims and payable only upon the closing of all accounts and settlement of all of River's obligations were to be given for the balance.

The price of the stock, $36 a share, was fixed by subtracting the expected loss from the original capital stock and then adding an amount equal to the maximum conceivable amount which any of the stockholders thought could be recovered on the claims and dividing the total by the number of shares. They then added an amount for "contingent recoveries" so that there was no possibility that the stock would be worth $36 per share. (24;[1] Ex. 15)

10. In order to consummate the transaction relating to the redemption of the Al Johnson and Winston Bros. stock, River's capitalization was reduced from $100 to $25 per share and $1,875,000 was transferred on the books from the capital stock to a capital surplus account. On December 20, 1950, Winston Bros. Co. and Al Johnson transferred to River their stock and received notes for $171,000 and $85,500 respectively.

11. In May 1951, the remaining stockholders other than Morrison-Knudsen Company decided to withdraw in a similar manner to Al Johnson and Winston Bros. Co. On May 18, 1951, a stockholders' meeting was held and the stockholders had discussions with respect to the value to be assigned to the shares of stock, the pending claims and their validity. The stockholders then esti-

---

1. All numerical references are to the stenographer's minutes of the trial.

mated that the losses would be about $1,-900,000. (Ex. 15) The possibility of further losses in closing out the job and the contingent value of the claims made it impossible to reach any agreement as to a realistic fixed value of the stock. (Ex. AC, p. 20)

12. In June, 1951, the construction project was substantially complete. The major part thereof, known as Lock 27, was 96.43 per cent complete, and the remainder, known as the pipe line, was 99.2 per cent complete. (Ex. 12)

Under date of June 1, 1951, Turner and Spencer, together with Raymond Concrete Pile Company, each agreed to sell its River stock to River for $44 per share, payable $2.20 per share in cash and the balance by promissory note in a form hereinafter described. Morrison-Knudsen Company, Inc., who was to remain as the sole original stockholder of River, agreed to contribute $125,000 to River to enable River to make this purchase of its own stock. The agreement provided that the responsibility for the conduct of the affairs of River thereafter would fall entirely on Morrison-Knudsen Company, Inc., who would forthwith elect its own slates of directors and officers for River. (Ex. 16)

13. The stockholders fixed the redemption price for the stock based upon the most anybody thought could be recovered on the claims (36) using the following "assumed case for computation," which is set forth in the minutes of the meeting of the Board of Directors of River of June 18, 1951 (Ex. 15):

| | | |
|---|---|---|
| Original capital stock | $2,500,000 | |
| Expected loss Lock 27 and Pipe Line | 1,900,000 | |
| | $ 600,000 | |
| Extra Work Orders in process not shown on books | 17,000 | |
| Attorneys' valuation of claims | 85,000 | |
| | $ 702,000 | |
| Apparent value on liquidation 25,000 shares (original amount of stock issued) | | $28.40 |
| Distribution $125,000 over 15,000 shares | | 7.14 |
| Provision for contingent recoveries | | 8.46 |
| | | $44.00 |

By the above calculation the Board of Directors fixed a value of $44 per share. Due to the speculative claims which were included by the Board of Directors in arriving at the $44 figure, there was no factual possibility that the plaintiff's shares would be worth more than $44 per share. (36) Additionally, the $1,900,000 expected losses could not be determined with any degree of certainty since the job was still in progress. The ultimate actual loss was $2,087,900, nearly $200,-000 greater than the amount assumed. Additionally, in reaching the amount of $44 per share, the computation mistaken-ly assumes 25,000 shares outstanding and fails to take into account that the 7,500 shares owned by Al Johnson and Winston Bros. had, on paper, been redeemed by River. Similarly, the computation mistakenly assumes that $702,-000 would be available in the capital account for distribution to shareholders, and fails to take into account that the capital account had, on paper, been reduced to $532,000 by the redemption of the Al Johnson and Winston Bros. stock for notes and cash amounting to $270,-000. Hence, at least on paper, only $532,000 was available in the capital ac-

count for distribution among the holders of 17,500 shares; the holder of each share would be theoretically entitled to approximately $24 from the capital account, or about $4 less than the $28.40 the Board of Directors of River assumed. Also, there was a mathematical error in the computation since $702,000 divided by 25,000 equals $28.08 per share rather than $28.40.

14. In June 1951, Turner and Spencer each sold all of their River stock to River for $220,000, payable $11,000 in cash on delivery of the stock and the balance by promissory note. The note provided as follows:

"FOR VALUE RECEIVED River Construction Corporation promises to pay unto Turner Construction Co. the sum of $209,000 at the Guaranty Trust Company, 140 Broadway, New York, New York, without interest and under the following terms and conditions:

"1. This note is executed and delivered in consideration of the sale by Turner Construction Co. to River Construction Corporation of five thousand (5,000) shares of the stock of River Construction Corporation, payment for which is to be made in the following manner: $11,000. upon delivery of the stock, and $209,000. as evidenced by this note.

"2. This note will be paid upon the completion of a certain contract undertaken by the River Construction Corporation, calling for the construction of Lock No. 27, Chain of Rocks Canal, Madison County, Illinois, contract No. W23065 Eng. 1220 for the United States of America. Payment of this note will not be made unless and until the closing of all accounts for the work to be performed by River Construction Corporation under said contract and the settlement of all of its obligations therefor.

"3. When and if the aforementioned contract is completed and upon closing of accounts of said contract it shall appear that such stock, exclusive of good will, tax credits and other similar intangibles, is worth less than $220,000. based on its original capitalization less losses on said lock contract and pipe contract, plus $125,-000.00, then and in that event this note shall be reduced by a sum represented by the difference between its then so determined true worth and $220,000.

"4. This note is not assignable.

"5. The purchase of this stock by River Construction Corporation from Turner Construction Co. does not in any way release or discharge Turner Construction Co. from its obligations as more particularly set forth in a certain letter dated 6/11/47 addressed to the United States Fidelity and Guaranty Company, 100 Maiden Lane, New York 7, New York, by Turner Construction Co.

"6. Payment of this obligation by River Construction Corporation is subordinated and subject to any and all rights, claims or demands of the United States Fidelity and Guaranty Company, its coinsurers and reinsurers."

15. It is evident from the terms of the note that the plaintiff could receive less than the face amount of the notes if things went badly thereafter but it could never receive more than the face amount of the note if things went unexpectedly well. (174–75)

16. Payments were made from time to time on the notes, the final one being in 1957. These payments aggregated $118,134.27 to Turner and a like amount to Spencer.

17. After the sale of the stock, Turner and Spencer submitted the resignations of directorships and offices in River held by any of their representatives. The sole remaining stockholder, Morrison-Knudsen Corporation, then caused its own slate of directors and officers of River to be elected. (39; Exs. 15, 23, 24) Morrison-Knudsen also caused River to retain new attorneys and accountants and caused River to move its main office to Fort Worth, Texas. (Exs. 25, 26) River's entire stock was thereupon divided equally between Morrison-

Knudsen and a group of construction concerns in Texas who were skilled in the construction of pipe lines. (Exs. 30, AB pp. 6–14)

18. After Turner and Spencer sold their River stock they had nothing further to do with the management or operation of the Lock No. 27 project. Their only contacts thereafter were the financial reports they received showing how the job was progressing in its final stages. However, Turner and Spencer still were subject to a contingent responsibility to the bonding company until the completion of the Lock No. 27 project by River.

19. In form, Turner's and Spencer's only interest in River was as its creditors, to see that they received proper payments under their promissory notes. Morrison-Knudsen Company directed the handling of River's claims against the United States Army, Corps of Engineers, calling upon former employees of River to supply facts and figures where necessary. (Exs. 20, 22, 25, 102, 153) Morrison-Knudsen, however, would submit the decision of the Corps of Engineers respecting the various River claims to the note holders for their recommendations on acceptance of the awards or appeal. (Ex. B; 68–70)

20. In substance, Turner and Spencer still retained the same equity in River as they held as stockholders. They still could suffer additional losses and they still remained liable to the bonding companies.

21. Turner and Spencer purchased their River stock in 1945 for $100 per share. They sold their stock in 1951 for $44 per share (Ex. 16), but finally received only $23.62 per share. (188) Both Turner and Spencer took as long a term capital loss on their tax returns applicable to 1951, the difference between their investment in River stock ($500,-000 each) and their 1951 sale price ($220,000). The loss was disallowed by the Internal Revenue Service on the theory that it was a future loss and therefore not deductible until the Lock

No. 27 project was completed, all accounts closed and the final payments on the notes made.

22. The plaintiff has not established that the note received in June 1951 had a fair market value for income tax purposes when received. The indefinite character of the future payments preclude attributing to the note any fair market value for income tax purposes.

23. At the time of the receipt of the note the job was not completed, the claims were undetermined and the plaintiff could possibly be called upon to contribute additional capital to River. Therefore, plaintiff has failed to prove that it suffered a realized loss in 1951 upon the exchange of its River stock for a non-negotiable contingent note. This transaction was not a closed transaction.

## II. DEPRECIATION ISSUE

24. In 1952, plaintiff Turner built for its own use three one-story "warehouse-type" buildings on a site in Hackensack, New Jersey. (50) These warehouses were used primarily for the storage and repair of plaintiff's construction equipment. (4) Plaintiff claimed a useful life of 25 years on these buildings for depreciation deduction purposes on its income tax return for the year 1952. The Commissioner determined that the useful life was 33⅓ years.

25. The warehouse buildings in Hackensack were built by plaintiff to replace buildings at Maspeth, Long Island, which were serving the same purpose. The Maspeth buildings had been built by plaintiff in 1927 and were sold by plaintiff at a substantial profit in 1954. They had a useful life of 50 or 60 years. (44–48)

26. The description of the three warehouse buildings at Hackensack is as follows:

(a) A building 35' x 100', used for office space, with brick piers and brick veneered cinder block curtain walls. The roof is concrete plank supported by structural steel framing, with fiberglass insulation under the roofing. This building has concrete floors with asphalt

tile surfacing. It is equipped with a sprinkler system, plumbing, toilets, a drinking fountain and electric lighting. (302)

(b) A 30′ x 200′ building used for equipment storage, similar in construction to the preceding, except that there is no exterior wall on one side. There is, however, a large closed room at one end of this building. This building has concrete floors and electric lights. (302)

(c) A 100′ x 120′ building used for repairs and storage, constructed of two Butler (steel) arches placed side by side, with sheet aluminum roof covering over fiberglass insulation and walls of brick veneer cinder block to sill height, with steel sach above that. This building has a reinforced concrete floor, a sprinkler system, toilets, electric lights and large motor-powered doors. Because of its ceiling height of 25′ to 30′, this building is suitable for palletized storage. (302–303, 318)

27. The yard surrounding the three warehouses was covered with asphalt paving providing space for the movement of large vehicles and equipment. Besides the asphalt paving, there are hard standing areas covered with rock and oil which are suitable for the storage of heavy equipment. (304, 306)

28. The three warehouse buildings were suitable to the neighborhood, which was an industrial area in which other warehouse buildings were located. (304) The future use of the neighborhood for industrial and warehouse purposes was predictable and land values were stable. (322)

29. Plaintiff has been in the construction business since 1902 and is considered one of the top construction companies. (47, 48) While the three warehouse buildings were of economical construction, they were expressly suited to the function which Turner built them to serve. (3–4, 303–304)

30. Although the buildings were subject to heavy use due to the nature of Turner's activities, the three buildings were maintained in good condition.

31. Although the experts called by the parties disagree on the useful life of the buildings, it is clear that the plaintiff has failed to prove that the Commissioner was incorrect in estimating that the three buildings had a useful life of 33⅓ years.

### III. PURCHASE AND SALE BY TURNER OF ITS OWN STOCK

32. For about forty years Turner had followed a policy of encouraging its key employees to purchase its stock. This policy was intended to insure continued employee loyalty and to encourage its employees to think of the continued financial success of the company. Turner also purchased back its stock from former employees who retired or from the estates of deceased employees.

33. In 1949, 1950, 1951 and 1952, plaintiff sold shares of its stock to employees. It did not, however, report any taxable gains on such dispositions, except in the year 1951 when it reported capital gains of $904.96. In each of the years in issue Turner made a profit on the sale of its stock to its employees. These profits are as follows (excluding the 1951 profits on which were reported as capital gains):

> 1949—$3,681.86
> 1950— 3,052.12
> 1951— 1,364.84
> 1952— 3,247.08

Total Profit:   $11,345.90

The Commissioner has determined that plaintiff should have reported this profit of $11,345.90 as a capital gain for the same years.

34. The price at which the stock was sold to the employees were fixed by plaintiff's Board of Directors at the beginning of each year. (10) In fixing a "fair price" each year, the Board of Directors made allowance for the fact that the price would be constant during the coming year, besides considering the book value and earnings of the stock. It also sought the advice of plaintiff's investment counsel and made compari-

sons with the prices at which stocks of plaintiff's competitors were selling. (13–14)

35. The stock sold by plaintiff to its employees had been purchased by plaintiff from former employees and retained in plaintiff's treasury. (54) The price plaintiff paid for the stock was not fixed by contract. There was no general written agreement between plaintiff and its employees prior to or during the years in which the sales occurred by which the employees bound themselves to sell their stock back to plaintiff when they left plaintiff's employ or when they died. (8) Similarly, plaintiff never committed itself to purchase any or all of the stock of its deceased employees. (13)

36. At the beginning of each year the Board of Directors of Turner fixed a limited number of shares of its stock which Turner would purchase during the coming year. (11–12)

37. Turner has shown by a fair preponderance of the evidence that its purchase of its stock from its employees and its resale of such Treasury stock is within the rule of United States v. Anderson, Clayton & Co., 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43 (1955) and that these transactions are not taxable.

### DISCUSSION

### I. RIVER LOSS

The government opposes the deductibility of the River loss in 1951 on the basis that the transaction was not closed. In the alternative, the government contends that River consummated a recapitalization in June 1951 and that therefore the transfer of River stock by the taxpayer for cash and notes constituted a tax-free exchange within the meaning of Section 112(b) (3), Int.Rev. Code of 1939.

■ It is elementary that a loss suffered on the sale, exchange or other disposition of property is not properly deductible from gross income unless such sale, exchange, or other disposition is a "closed transaction." In general, losses must be evidenced by complete transactions, fixed by identifiable events, bona fide and actually sustained during the taxable year claimed. However, there is an exception to the general rule that only realized losses are deductible. The exception is operative where "[i]n the case of losses which are so reasonably certain in fact and ascertainable in amount to justify their deduction, in certain circumstances before they are absolutely realized." Commissioner of Internal Revenue v. Winthrop, 98 F.2d 74 (2d Cir. 1938); Lucas v. American Code Company, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930).

■ Whether the rule or exception is applicable, the taxpayer has the burden of establishing that it is entitled to deduct the loss in the year claimed. Boehm v. Commissioner of Internal Revenue, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945). It is evident that the transaction in June 1951 involving the redemption of plaintiff's stock was not closed and completed since the plaintiff did not know and could not determine what its loss would be. The construction was not complete, claims of uncertain amounts were pending and additional losses in completing the project could not be predicted with any degree of certainty. The amount of the final loss could not be ascertained as of June 1951 and the amount actually received in 1957 was nearly 100% less than the agreed price of $44 per share.

The taxpayer contends that the sale of stock to River in 1951 fixed the maximum amount that it might receive for its stock. Therefore, plaintiff urges, it sustained a deductible loss in 1951 in the amount of the difference between its acquisition cost ($500,000) and $220,-000, the sales price. The taxpayer further contends that the subsequent failure of River to pay full purchase price of the stock merely created further losses to the plaintiff which were not known until 1957. It is apparent, therefore, that the taxpayer is attempting to satisfy the requisites of a closed transaction by saying that the $280,000 loss on the sale of the stock in 1951 was

closed since it set both a minimum loss figure and a maximum value to the notes. Therefore, the taxpayer argues that the element of uncertainty relates only to the final value of the note and not to the difference between the original subscription price ($500,000) and the sales price ($220,000).

This position of the taxpayer is untenable. While there is nothing wrong with a taxpayer attempting to decrease the amount of his taxes or altogether avoid them by means which the law permits, "[t]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). Equally appropriate in determining the issue before the court is the principle "[w]hether the transaction under scrutiny is in reality what it appears to be in form." Johnson v. Commissioner of Internal Revenue, 86 F.2d 710, 712 (2d Cir. 1936).

■ Here, the sale was fictitious. The price of $44 per share was ill-suited to the economic realities of the situation. Although the "sale" of the stock in form divorced the plaintiff from River as a stockholder, in reality it did not. Plaintiff cannot avoid the fact that its ultimate loss upon the closing of the accounts on the Lock No. 27 project would be identical whether it calls itself a creditor of River or a stockholder of River. The fact that River under the direction of Morrison-Knudsen acquired new stockholders does not alter the fact that for the present purposes the sale by plaintiff to River was fictitious since the new stockholders and River, with the exception of Morrison-Knudsen, had nothing to do with the Lock No. 27 project. Therefore, it is clear that plaintiff is attempting not only to regulate the timing of its loss but also is trying to split one loss into two. This is clearly prohibited by Section 23(f) since it did not sustain a loss during the taxable year 1951. The 1951 sale of River stock falls far short of the requirements of Treas.

Reg. 111, § 29.23(e)–1, which states: "In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses."

On the basis of the foregoing it is unnecessary to discuss the government's alternative position.

## II. DEPRECIATION ISSUE

■ No discussion of the law relative to the allowable rate of depreciation is necessary. The depreciation issue is basically a fact issue.

## III. PURCHASE AND SALE BY TURNER OF ITS OWN STOCK

Treas.Reg. 111 § 29.22(a)–15 provides:

*"Acquisition or Disposition by a Corporation of its Own Capital Stock.* Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances * * *.

"But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another * * *. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Internal Revenue Code."

■ The leading case on the tax consequences of the sale of treasury stock to employees is United States v. Anderson, Clayton & Company, 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43 (1955). As enunciated in Anderson, supra, whether the transactions are taxable

"depends, in the final analysis, on whether respondent [taxpayer] corporation dealt with its shares of treasury stock 'as it might' have dealt with another corporation's stock." 350 U.S. at 59, 76 S.Ct. at 27. Viewing these transactions as we must with the thought that the tax consequences depend upon "the real nature of the transaction, which is to be ascertained from all its facts and circumstances," we are forced to conclude that the instant transactions are "limited to a wholly intracorporate purpose with no element of speculation or gain envisioned from dealing in its shares" and "does not constitute dealing by the corporation in its own shares as it might deal in the shares of another corporation within the meaning of the regulation." 350 U.S. at 59, 76 S.Ct. at 28. See Regulation 111, Section 29.22(a)–15.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action by virtue of 28 U.S.C. § 1346.

2. The surrender by plaintiff of its stock and the simultaneous receipt of $11,000 in cash and River's note, which did not bear interest, was not assignable, was subordinate to the sureties, and final payment was contingent upon the net worth of River at the completion of the contract, was not a closed transaction for income tax purposes. Estate of Raymond T. Marshall, 20 T.C. 979. Plaintiff's money was still tied up in the River Construction Corporation although the evidence of its investment was changed from stock to a contingent note.

3. Plaintiff has not sustained its burden of proof in establishing that loss claimed in 1951 was properly deductible in 1951. Section 23(f), Int.Rev.Code of 1939; Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720 (1929); Estate of Chester W. Cuthell, 3 T.C.M. 313 (1944); Dresser v. United States, 55 F. 2d 499, 74 Ct.Cl. 55 (1932), cert. denied 287 U.S. 635, 53 S.Ct. 85, 77 L.Ed. 550.

## II.

4. Under 26 U.S.C. § 23(l) plaintiff could take a reasonable allowance for depreciation of its three Hackensack warehouse buildings. The purpose of depreciation was to enable plaintiff to recover the cost of the buildings over the period of its useful life. Hertz Corp. v. United States, 364 U.S. 122, 128, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1959).

5. Useful life of a building for business purposes depends, inter alia, on the suitability of the structure to its use and location, its architectural quality, the stability of land values in its area and the extent of the maintenance. Bulletin "F" Internal Revenue Service (Revised Jan. 1942) p. 7.

6. Turner Construction Company has failed to meet its burden of proving that the Commissioner was incorrect in estimating that the three Hackensack warehouse buildings constructed by plaintiff for its own use had a useful life of 33⅓ years.

## III.

7. In selling its stock to its employees in 1949, 1950, 1951 and 1952 plaintiff was not dealing in its own shares as it might have dealt in the shares of another company within the meaning of Reg. 111, Section 29.22(a)–15.

8. Plaintiff has met its burden of proving that the Commissioner was wrong in determining that the profits realized by Turner by the sale of its stock to its employees in 1949, 1950, 1951 and 1952 should be taxed as capital gains.

Defendant's Exhibit 1 accompanying Government's Exhibit AC is not admissible into evidence.

The complaint is dismissed as to the River and Depreciation issues. As to the Sale of Treasury Stock, the plaintiff prevails with interest. No costs are to be awarded to either party.

Settle judgment on notice in accordance herewith.